THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* SAMMIE JOHNSON, Defendant-Appellant.

(No. 55983;

First District (4th Division)—May 22, 1974.

*Rehearing denied June 26, 1974.*

James J. Doherty, Public Defender, of Chicago (Shelvin Singer, Assistant Public Defender, of counsel), for appellant.

Bernard Carey, State's Attorney, of Chicago (Kenneth L. Gillis, Patricia C. Bobb, and John B. Adams, Assistant State's Attorneys, of counsel), for the People.

Mr. PRESIDING JUSTICE ADESKO delivered the opinion of the court:

Defendant, Sammie Johnson, was charged by indictment with the offense of murder. After a jury trial in the Circuit Court of Cook County, he was found guilty and sentenced to serve a term in the Illinois State Penitentiary of not less than 14 years nor more than 40 years. Defendant appeals this conviction claiming that:

(1) The testimony of the State's witnesses was not sufficient to prove him guilty beyond a reasonable doubt;

(2) The use at trial of a statement made by defendant was a violation of his right to due process of law; and

(3) Certain remarks by the trial judge made at trial were prejudicial to defendant and as a result, defendant was denied a fair trial.

The facts were as follows:

At about 9:45 on the evening of August 31, 1970, Herron Jackson was stabbed to death in a bar on the south side of Chicago. Several months later, the defendant surrendered to the authorities in Los Angeles, California and after extradition proceedings was flown back to Chicago aboard a commercial airliner accompanied by two Chicago police officers. Dur-

ing this flight, defendant was alleged to have made an oral statement to the officers. He made substantially the same statement when he reached Chicago, though he declined to make a formal written statement. A motion to suppress this statement was made prior to trial. After a hearing, the motion was denied.

At trial, Herron Jackson's "common-law wife", Gladys Williams, testified on behalf of the State. She had entered "Shorty's" bar with Jackson at about 8 P.M. on August 31, 1970. The two of them sat down at the bar and drank for the next hour and a half. During that time Jackson consumed one or two "shots" of whiskey and a glass of beer. Defendant entered at about 9:30 P.M. and sat down to the left of Jackson at the bar. Gladys Williams stated that when she got up to look for her address book in her purse, defendant stood up beside her and looked into her purse. She said that defendant did not speak to her and he did not reach or attempt to reach into her purse. At this point, Jackson jumped up and said twice, "Hey man, what the hell are you doing in my old lady's purse?" Following a brief verbal altercation between Jackson and the defendant, the owner of the bar asked the defendant to leave.

About 20 minutes later, defendant re-entered the bar. Gladys Williams tapped Jackson on the knee to bring this to his attention. As Jackson spun around to face him, defendant walked up to him and began to cut him with a knife. Jackson attempted to rise but fell to the floor, because of his wounds. Defendant continued to cut at Jackson as he lay on the floor. He finished this and walked out of the bar. Josh "Shorty" Williams (no relation to Gladys) and his wife Fannie testified to the same basic sequence of events, though their versions differed as to several details.

Sammie Johnson testified in his own behalf at the trial. His version of the incident differed in several important aspects. He claimed that after Gladys Williams had stood up and opened her purse, Jackson and he got into an argument at the bar. Jackson jumped down from his barstool, grabbed defendant, and threatened to "break his neck." At this point "Shorty" Williams stopped the fight and defendant walked to a pool table at the back of the room. He did not leave the bar, nor did Herron Jackson. Jackson walked towards defendant from the bar. Though defendant wanted to "talk" about it, Jackson refused and continued to approach. Defendant said that he was frightened because of Jackson's prior threats; warned him to get back and told him that he had a knife. Jackson struck the defendant several times. Defendant tried to evade the attack but Jackson continued to hit him. Defendant stabbed Jackson several times and fled, throwing away the knife.

Defendant went home, where he stayed for several hours until he fled to California. He stated that he did so because he had been told that

Jackson was a member of a street gang and he feared possible retaliation. He further stated that at this time he did not know that Jackson was dead. He surrendered himself in California after learning he was sought in Chicago.

Defendant first claims that he was not proven guilty beyond a reasonable doubt since the testimony of the State's witnesses was improbable and unworthy of belief. To quote defendant's brief, this testimony is characterized as being, "* * * replete with self-impeachment; teeming with glaring contradictions; [and] it is conflicting to the point of confusion." Defendant examines in great detail portions of the testimony presented by the State's witnesses and points up each and every instance where the testimony of one witness differs, even slightly, from that of another. The same is done with the evidence that defendant believes is improbable or unbelievable, either in light of the testimony of the other witnesses or with defendant's version of the occurrence.

■■ We find that defendant was proven guilty beyond a reasonable doubt. The basic question at issue here is the credibility to be given the testimony of the witnesses. Determination of the credibility of witnesses is the function of the jury and, as such, a reviewing court will defer to this judgment (*People v. Stewart*, 46 Ill.2d 125, 202 N.E.2d 911), unless it is palpably erroneous. (*People v. Ostrand*, 35 Ill.2d 520, 221 N.E.2d 499.) The defendant acknowledges this but submits that: "[T]he law is not so vain that it insists upon blind obedience to such an unyielding and simplistic standard where, under circumstances such as those in the present case, the rights of an innocent man are summarily relegated to an inferior and perverted status."

■■ It is obvious from this statement that the standard used by this court to review questions of credibility and evidence is misunderstood by defendant. While a reviewing court will defer to the judgment of the jury in these matters, this does not mean that the evidence presented below is ignored. On the contrary, the record of the testimony is carefully scrutinized by this court to make certain that the jury's determination is not "palpably" in error. This is hardly "blind obedience" to the determination made below. Each instance of "conflicting" or "improbable" testimony in the instant case has been reviewed by this court and we find that the evidence was sufficient to sustain the jury's verdict of guilty. It is not, however, this court's function to substitute its judgment of the evidence presented for that of a jury's, but rather to make certain that the jury's decision had a sufficient basis in the record to be sustained.

Defendant next contends that the use at trial of the statements he made to police officers on the flight from California and immediately thereafter was improper as it was the result of "inherent psychological compulsion."

The use of statements given by persons in the custody of law enforcement officers is governed by the rules set forth in *Miranda v. Arizona*, 384 U.S. 436, 16 L.Ed.2d 694, 86 S.Ct. 1602, requiring the giving of what is commonly referred to as, "*Miranda* warnings". It is clear from the record that the defendant was given these warnings. Defendant does not seriously dispute that these warnings were given, but states that:

"It is our contention that the police were bound by an affirmative duty to refrain from questioning defendant at least until such time that he could be guaranteed access to a reasonable and functionally effective means of communication with the outside world."

Defendant was flown to Chicago via commercial airliner, he was not handcuffed after take-off, and there is no evidence in the record to show that he was in any way isolated from the other passengers. During this flight he was informed *inter alia*, that he had a right to remain silent, that he had a right to have an attorney present during any questioning, and that if he could not afford a lawyer, one would be provided for him. Defendant said that he understood these rights and thereafter made the statement which he now claims should not have been admitted at trial. (An identical proceeding took place at the police station after the plane arrived in Chicago.) Defendant characterizes this as "illegal police conduct" and now claims that he was "deliberately maneuvered into an extremely vulnerable position." He further states that since no attorney could have been provided during this flight, his right to have counsel before any questions were put to him was "reduc[ed] * * * to little more than a delusion, a mockery and a snare * * * [t]hen the police moved in to trade on his insecurity." We find this argument to be totally without substance.

Defendant's argument, if we may put it simply, is that no waiver of his right to counsel or his right to remain silent could have been valid since if he had in fact requested counsel, it would have been impossible for the officers on the aircraft to procure one until the plane landed sometime later. As was noted in *Miranda*, when these rights were delineated:

"The defendant may waive effectuation of these rights, provided the waiver is made voluntarily, knowingly and intelligently." (384 U.S. at 444.)

In the instant case, our review of the record shows that defendant's waiver met this standard in both instances. Defendant has offered no authority, either in his brief or during oral argument before this court, to support his contention that since counsel for defendant would not have been available until the aircraft landed, that no waiver of his rights was possible. Our research has also failed to disclose any support for this position.

■■ Defendant states repeatedly in his brief that the fact that he was on the aircraft with the officers and that no counsel could have been provided was in some fashion a form of psychological coercion. We fail to discern how the fact that defendant was in a commercial airliner, surrounded by other passengers, can be considered analogous to being held incommunicado and under pressure by police officers to make a statement. Defendant was informed of his rights under *Miranda*, he was specifically informed of his right to have counsel present during any questioning, he stated that he understood these rights and then he made a statement to the officers that he had stabbed Herron Jackson, fleeing afterwards because he was scared. If defendant had refused to make a statement until he could obtain the advice of counsel and the officers had persisted in attempting to convince him to do so, notwithstanding his request, then there would be some merit to defendant's argument. We find that neither the fact that the statement was made during the flight nor the actions of the police officers, acted to coerce defendant into making these statements.

Defendant's final contention on appeal arises out of the following occurrence at the trial. Just after cross-examination of defendant had begun the following took place:

"THE COURT: Someone is signalling back there. Go ahead. Go ahead.

MR. REYNOLDS [Defendant's Counsel]: Your Honor, I am objecting. May we have a sidebar for a moment please?

(Thereupon, the following proceedings were had outside the hearing of the jury):

THE COURT: Somebody is signalling back there, the third man, one, two, three in the row in front of the policeman there.

MR. REYNOLDS: Judge, I have an objection to the Court's remark.

THE COURT: I am not talking to you. I sent my private bailiff back there.

MR. REYNOLDS: I heard you stand up and say, 'Who is that signalling.'

THE COURT: All right.

MR. REYNOLDS: I don't know that that man was signalling back there.

THE COURT: That is all right. I sent my private bailiff back there.

MR. REYNOLDS: I have an objection and I move for a mistrial.

THE COURT: Objection overruled. Let the record show that I sent my private bailiff back there. All right."

Defendant urges that the trial judge was in error in failing to grant the motion for mistrial since:

> "Disparaging remarks by the trial judge, the effects of which were intensified by the crucial moment of trial, and were so ripe with inferences prejudicial to defendant's cause that his right to a fair trial was rendered a nullity."

Defendant has again failed completely to provide any support for his claim that this "outburst", as the incident is referred to several times in the brief, was in any way improper.

■■ Defendant concedes that the trial court has a "duty to protect the decorum and dignity of the courtroom" (*People v. Jerrels,* 98 Ill.App.2d 213, 240 N.E.2d 479), but evidently does not wish the court to exercise this duty. Defendant cites a single case that is on point with this issue, *People v. Yates,* 339 Ill. 421, 171 N.E. 557, but the court in *Yates* upheld the right of the trial judge to admonish spectators to prevent signalling or other gestures directed at the person who is testifying. Defendant further argues that the trial judge should have made some statement to the jury regarding the incident or in some other manner attempted to "cure" the prejudice caused by the initial statement. We are of the opinion that the actions of the trial judge were correct and no prejudice to defendant resulted from them. Any statement to the jury regarding the incident would not have resulted in a "cure", but would simply have served to focus their attention on the occurrence.

For the foregoing reasons, the judgment of the Circuit Court of Cook County is affirmed.

Judgment affirmed.

BURMAN and JOHNSON, JJ., concur.